UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

JAMES JENKINS,

                        Plaintiff,

-against-

COUNTY OF NASSAU; Police Officer
DANIEL P. CONCANNON, Shield #3808;
and Police Officer ROBERT D. GALGANO,
Shield #2774,

                        Defendants.
----------------------------------------------------------------X

**BENCH TRIAL**
**DECISION AND ORDER**

CV 19-557 (GRB)

**GARY R. BROWN, United States District Judge**

On April 26, 2021, the Court held a bench trial upon consent in this excessive force case. Five witnesses testified, including the plaintiff, two defendant police officers, a supervising officer and a non-party detective, and several documents were received into evidence.

The undisputed facts establish that the defendant police officers conducted an improper and unlawful search of the plaintiff, an automobile passenger who, no one disputes, did nothing wrong, suspicious or threatening. Furthermore, the evidence demonstrates that those police officers, who created false police records and made demonstrably false statements during the trial, used excessive and improper methods while taking these actions against the plaintiff. The precise contours of these abuses are discussed herein. In short, plaintiff has proven his case against the defendant officers, who are subject to judgment for compensatory and punitive damages totaling $40,000.

1

**PROCEDURAL HISTORY**

The procedural history of this matter is set forth in Magistrate Judge Locke's detailed Report and Recommendation, previously adopted by this Court, which is incorporated herein by reference. *See* Docket Entry ("DE") 34. The amended complaint filed as a result of that determination sets forth the following causes of action against the defendant officers:[1] (1) false arrest; (2) excessive force; (3) battery; (4) assault; and (5) unlawful search. *See* DE 37.

**FINDINGS OF FACT**

The evidence adduced at trial established the following:

In the early morning hours of January 30, 2018, plaintiff James Jenkins ("plaintiff" or "Jenkins"), following dinner with a friend, called David Graham ("Graham"), a neighbor, for a ride home. Trial Transcript ("Tr.") 11. Shortly after Graham picked up plaintiff, the defendant officers Daniel P. Concannon ("Concannon") and Robert D. Galgano ("Galgano"), using emergency lights but no siren, stopped Graham for traffic violations. *Id.* at 11-12. The defendants approached the vehicle, one on each side of the car. *Id.* at 12. Galgano approached Graham, the driver, who provided a driver's license but acknowledged that his license had been suspended. *Id.* Galgano then asked Graham to get out of the car, and Graham complied. *Id.* at 13.

*The Altercation and Arrest of Graham*

Plaintiff testified to "an initial contact [between Graham and Galgano] that [he] guess[ed] turned into some sort of tussle that resulted in the officer taking [Graham] down and the other officer going to help him." *Id.* at 13. This altercation, plaintiff testified, ended with Graham breaking a tooth, and "they broke the taser on his back." *Id.* Graham was handcuffed and an ambulance was called. *Id.* at 13-14. As to these events, plaintiff's testimony was vague and, given his proximity to the events, inexplicably threadbare.

---

[1] While the complaint purports to assert some of these claims as against the County – including under a *respondeat superior* theory – and unnamed John Doe officers, no effort was made to prove these claims at trial or provide any *Monell* evidence, and those defendants are dismissed from the action.

2

The officers gave a fuller account with regard to the altercation with Graham. Galgano testified that when he approached Graham in the car, Graham was acting nervously, looking about and "making a movement towards his right cargo pocket, kept touching and reaching for it as if something was there." *Id*. at 43. Galgano asked Graham "to walk to the rear of the vehicle," where Galgano began to effect an arrest for the suspended license. *Id*. at 44. He reached into Graham's right cargo pocket and, Galgano testified, withdrew a "red candy wrapper" which he opened, only to discover that "inside the candy wrapper was a white rock-like substance which [Galgano] believed to be crack cocaine." *Id*. The candy wrapper was about the size of a cough drop.[2] *Id*. at 84.

Galgano told Graham to put his hands behind his back in anticipation of handcuffing him. *Id*. at 45. Remarkably, rather than comply, Graham snatched the candy wrapper from Galgano's hand and "began to resist." *Id.* Then, according to Galgano and Concannon, Graham "jumped back inside his vehicle" while "screaming, kicking [and] actively resisting arrest." *Id*. At that point, according to the officers, Graham was "laying across the driver's seat . . . [with his] head almost in the passenger's seat." *Id*. at 46.[3] The officers forcibly removed Graham from the car, who fled yet again, flailing his arms and elbows. *Id.* at 47. Galgano brought him to the ground and Concannon deployed his taser. *Id*. Graham was then handcuffed and eventually taken away by ambulance. *Id*. at 47-48.

*The First Search and Detention of the Plaintiff*

Without providing much detail, Galgano and Concannon testified that they searched for the missing candy wrapper but were "unable to find it."[4] *Id.* at 48. The officers then turned their attention to plaintiff. By *all* accounts, throughout the melee with Graham – and indeed throughout the entire

---

[2] Notably, Galgano was the only testifying witness who saw the candy wrapper. Tr. 103. The Court has little doubt, however, as to this part of his testimony, as the existence of this item explains many of the events that followed.
[3] The plaintiff denies that Graham reentered the vehicle during the struggle. Tr. 13. The undersigned does not credit this testimony, however, as the subsequent actions of the officers appear consistent with Graham's reentry into the vehicle and plaintiff's proximity to Graham. As noted, plaintiff's vague account of the struggle further undermines his testimony on this point.
[4] Exactly what steps the officers took to locate the errant evidence before the first search of Jenkins is unclear from the record.

3

encounter – plaintiff had done nothing suspicious, furtive, threatening, illegal or had acted in a way that was anything but cooperative and compliant with the police. *Id*. at 14, 49, 62, 77-80, 106 (Concannon describing plaintiff as "well mannered" toward the officers). Throughout the encounter, "there was nothing in particular about Mr. Jenkins's actions that led [defendants] to believe that Mr. Jenkins possessed the wrapper." *Id*. at 61-62. Concannon testified that, while Graham was lying across the front seat, he had his hands tight beneath his body, and that he did not see Graham throw anything into the car or stretch his arms toward the plaintiff. *Id*. at 104. And while it was *possible* that Graham had passed the wrapper to plaintiff, it was also possible that Graham "could have put it in the [vehicle's] console, or his cargo pocket, or the back seat or the front seat or swallowed it." *Id*. at 61.

Having failed to locate the candy wrapper, Galgano asked plaintiff to get out of the car, and told him to place his hands behind his back (and handcuffed him[5]) so he could conduct a pat down search. *Id*. at 49-50. The pat down, purportedly conducted by the officer "[f]or [his] safety and the safety of Mr. Jenkins based on the encounter [he] had with Mr. Graham," proved negative, as Galgano found nothing on Jenkins's person. *Id*. at 49-50. On cross-examination, however, Galgano acknowledged that this first search continued far beyond a pat down search for weapons:

> Q. So, let's talk about that first search of Mr. Jenkins. You did a careful and thorough search up and down Mr. Jenkins' whole body, right?
>
> A. That's correct.
>
> Q. You carefully and thoroughly searched the pockets on his pants, right?
>
> A. Correct.
>
> Q. And you carefully and thoroughly searched any pockets on his jacket, correct?
>
> A. Correct.
>
> Q. And you carefully and thoroughly searched the tops of his socks, correct?

---

[5] Galgano testified that he handcuffed plaintiff before the first search, while plaintiff stated the handcuffs were placed on him after that search. Tr. 15, 50.

4

>A. Correct.
>
>Q. And his belt buckle?
>
>A. Correct.
>
>Q. The waistband of his pants?
>
>A. As I would search anyone else, the waistband of his pants.
>
>Q. The waistband of his underwear?
>
>A. Correct.
>
>Q. And you felt his buttocks outside his pants, correct?
>
>A. Correct.
>
>Q. And in this first careful and thorough search of Mr. Jenkins, you didn't find anything, correct?
>
>A. That's correct.

*Id*. at 64-65. Thus, while framed as a search for the purposes of safety, this search went beyond those bounds, as it included searching the interior of all of his pockets. *Id.* Indeed, Galgano testified that in searching plaintiff, he was, in fact, searching for the missing evidence, not just weapons or other dangerous items which are generally the object of a pat down search. *Id*. at 64. Galgano testified that he did not ask for, or obtain, plaintiff's consent to conduct this search. *Id*. at 66-67. The search produced nothing. *Id*. at 50.

Galgano then handcuffed plaintiff, sat him on the curb and later placed him in the police vehicle. *Id*. at 15-16, 50. With plaintiff secured in this manner, the officers continued the search for the missing candy wrapper, searching Graham's vehicle and "the vicinity around the vehicle."[6] *Id*. at 50. That search included the glove compartment of the vehicle, beneath the floor mats, and between the gaps in the seats. *Id*. at 67. Moreover, this search, Galgano testified, followed a thorough

---

[6] It is curious that, given the sprawling altercation with Graham, the officers could determine that they had conducted a search in the dark of the interior and exterior of the vehicle and its environs for an item the size of a lozenge with sufficient thoroughness to rule out its being stashed, dropped, kick or thrown.

search of Graham's person. *Id*. at 63, 67. Yet all of these efforts yielded nothing.

*The Second Search of Plaintiff*

Failing to find anything in the car or on Graham's person, the officers again turned their attention to plaintiff. *Id.* at 68. Galgano did not ask for consent, but rather "informed Mr. Jenkins of why [they] were searching him and asked him if he had anything on him." *Id*. at 51, *cf. id*. at 16. Galgano's testimony made it patent that the object of the search was the missing candy wrapper, noting that the search was conducted after plaintiff "said he didn't have the evidence on him." *Id*. at 51. Indeed, Galgano admitted being frustrated that the evidence that Graham had stolen from him was still missing, and that he "decided to search Mr. Jenkins again to see if [he] missed it the first time." *Id*. at 68. Regarding this second search, Concannon admitted that, after a basic pat down proved negative, the officers "continued [their] search in an attempt to find evidence." *Id*. at 107.

Galgano and Concannon conducted this second search of the plaintiff, who was still handcuffed, which included the inside of the plaintiff's pockets, inside the waistband of his pants and underwear and inside of his socks. *Id*. at 68-69, 107. Galgano also acknowledged unbuckling the plaintiff's pants. *Id*. at 69. And, again, Galgano testified, the search was non-consensual. *Id*. at 70, 108. By the time of the second search, again by all accounts, a number of other officers had arrived and were watching as defendants performed this search. *Id*. at 98 (Concannon testifies that several other officers were "all standing right there" several feet away), 131 (Lt. Griesman testifies that more than five police units responded to call), 142 (Cardona testifies to same).

The plaintiff testified, though, that the second search proved far more invasive. According to plaintiff, in addition to the search efforts described by Galgano, the officer:

> put on both these two rubber gloves and the first thing he did was unbuckle my belt and he took my belt. Then unbuckled my pants and he pulled them down around my ankles. After that he took down my underwear and told me to spread my thighs a little bit, and then . . . proceeded to take his hands and move my genitals to the side and search like the inner area . . . .

*Id*. at 17; *cf. id*. at 18. According to plaintiff, the officer pulled his underwear down to his ankles,

6

and touched his genitals and buttocks during the search. *Id.* at 18. Plaintiff testified that Galgano told him "to cough" while handling his genitals, presumably a sardonic reference to a medical examination. *Id*. at 17-18. Finding nothing, the officer permitted plaintiff to pull up his clothing and sat him again in the car. *Id*. at 18. Both officers flatly deny this aspect of plaintiff's account. *Id*. at 54-55, 97-98. However, several additional sources of evidence help in examining this conflict, discussed further below.

Following the second search, but while plaintiff was still detained, Lt. Joseph Griesman, a supervisory patrol officer, interviewed the plaintiff. *Id*. at 132. Griesman testified that plaintiff "was in temporary custody of the Nassau County Police Department" at that time. *Id.* The purpose of his discussion with the plaintiff was to complete a "physical condition questionnaire" and it was Griesman's responsibility to "question [him] regarding [his] temporary detainment." *Id.* It is undisputed that the plaintiff did not make any complaint to Griesman about his physical condition or his treatment, and Griesman recorded those details on a PDCN-79 form, which plaintiff refused to sign. *Id*. at 133-34, 136. Regarding his decision not to notify Griesman of what has transpired, plaintiff observed "I was just ready to go home. I was scared at that point." *Id*. at 20.

Plaintiff was then released and walked home; the entire encounter took about an hour. *Id.* at 22, 101.

*Documents created by Defendants*

Also received into evidence were several written records prepared by the defendants and Griesman. Notable only for inapt brevity, the defendants prepared memo book entries relating to that evening. Concannon made an entry reading only "VTL [meaning 'Vehicle and Traffic Law'] Ridge Rd/Renfrew Ave" at 1:35 a.m. Pl. Ex. 1. Similarly, Galgano's entry for the same time reads "Car stop @ Renfrew Ave./Ridge Rd." Pl. Ex 2. Given the extraordinary events that transpired that evening, this extreme economy of language seems unwarranted if not inappropriate.

Sometime later, at the direction of a superior officer, Galgano and Concannon prepared and

7

executed narrative statements about the subject events. Curiously, these statements, dated January 24, 2019, indicate that they were not given "voluntarily" and "may not be used against me in any subsequent criminal proceedings." Pl.'s Ex. 5 & 6. The statements prove problematic in several respects.

First, the documents reveal that the sworn testimony by the officers concerning the preparation of these statements was false. Both defendants testified at deposition that they had prepared the statements independently. Tr. 75 (Galgano testifies that he wrote it "myself . . . it was just me"); *id*. at 112 (Concannon testifies that nobody wrote the statement for him or told him what to write). Furthermore, the officers testified before this Court that they had not made an effort to coordinate their statements. *Id*. at 74, 112. However, examination of the exhibits show that the statements are largely identical, most paragraphs are nearly or entirely verbatim, and the documents even share typographic errors, such as the misspelling of Lieutenant Griesman's name. *See* Pl.'s Ex. 5 & 6. Comparison of the two paragraphs in each statement that mention plaintiff (the remaining paragraphs focus solely on Graham) make the problem plain:

| Para. | **Concannon's Statement** | **Galgano's Statement** |
|---|---|---|
| 7 | Officer **Galgano** and I then immediately requested an ambulance to treat David Graham. Other Officers and a Supervisor also arrived on scene. After being placed into custody David Graham did state to me "I'm sorry, I shouldn't have run like that." After a vigorous and lengthy search, Officers were unable to locate the aforementioned white rock like substance. Subject Jenkins, was removed from the vehicle without incident and consented to a search of his clothing, to show Officers he was not concealing said Crack Cocaine that David Graham was attempting to conceal or destroy. | Officer **Concannon** and I then immediately requested an ambulance to treat David Graham. Other Officers and a Supervisor also arrived on scene. After being placed into custody David Graham did state to me "I'm sorry, I shouldn't have run like that." After a vigorous and lengthy search, Officers were unable to locate the aforementioned white rock like substance. Subject Jenkins, was removed from the vehicle without incident and consented to a search of his clothing, to show Officers he was not concealing said Crack Cocaine that David Graham was attempting to conceal or destroy. |

8

| 8 | During the course of this entire Interaction James Jenkins obeyed our verbal commands. We did conduct a protective pat down to ensure that he was not concealing any weapons. Upon conclusion of the investigation, James Jenkins was released from scene without incident. At no point did James Jenkins express any discontent towards us. Prior to James Jenkins being released he also received a physical questionnaire by Lt. Griesmen [sic] at which time he never indicated any problems or mistreatment | During the course of this entire Interaction James Jenkins obeyed our verbal commands. We did conduct a protective pat down to ensure that he was not concealing any weapons. Upon conclusion of the investigation, James Jenkins was released from scene without incident. At no point did James Jenkins express any discontent towards us. Prior to James Jenkins being released he also received a physical questionnaire by Lt. Griesmen [sic] at which time he never indicated any problems or mistreatment |
|---|---|---|

*Id.* ¶ 7-8 (bold added for emphasis). As is readily seen, other than the names of the officers in the first line, these two paragraphs are not only verbatim, but even include the same misspelling of Griesman's name, capitalization errors and punctuation oddities. The similarities are undeniable, and thus cannot be attributed to coincidence, yet one of the defendants clung to this farcical explanation in sworn testimony. Tr. 112 (Concannon testifies it "must be" a coincidence).

Worse yet is the content of the statements. Each of the defendants' statements contains demonstrably false assertions concerning critical issues in the case: that plaintiff had consented to be searched, and the nature and number of searches that were conducted. Each defendant wrote in their statement that "Subject Jenkins . . . consented to a search of his clothing, to show Officers he was not concealing said Crack Cocaine that David Graham was attempting to conceal or destroy." Pl's Ex.'s 5 & 6, ¶ 7. The defendants also described the search as "a protective pat down to ensure that he was not concealing any weapons." *Id.* at ¶ 8. Neither statement makes any reference to a second search.

Finally, the documentary record includes the PDCN-79 form completed by Griesman, which apparently accurately reports the facts related by plaintiff, to wit: that he did not sustain any physical injuries. Pl. Ex. 1. However, there is a troubling aspect to the narrative contained on that form. On that document, Griesman noted that plaintiff "was temporarily detained, searched and handcuffed for

9

officer safety." *Id.* The implication was that the defendants had performed nothing except for a pat down search for weapons. When questioned, Griesman acknowledged that this was simply an assumption on his part, as he had neither observed the search nor discussed the matter with the defendants before completing the form. Tr. 136-37.

*Conversation with Detective Cardona*

The testimony at trial bore out one additional encounter which proves important. Plaintiff testified that, following the second search, while he was still handcuffed in the police vehicle, Fabian Cardona, another officer, approached the plaintiff and inquired as to what had transpired. *Id*. at 19. Coincidentally, the plaintiff and Cardona knew each other, having attended junior high school together. *Id.* at 19-20. Plaintiff, who reportedly was "mortified" by the experience with Galgano, testified that he told Cardona that "the boys just violated me." *Id*. at 19-20. According to plaintiff, Cardona explained that he had just gotten to the scene, and the conversation trailed off. *Id.*

Cardona, who testified at trial, largely corroborated plaintiff's account of this conversation, adding some detail. Cardona arrived at the scene, and recognized the plaintiff as an old school acquaintance, then seated in the back of a police car. *Id*. at 144-45. He approached the vehicle and asked plaintiff about what had transpired, as he did not witness the search. *Id*. Cardona noted that plaintiff seemed "upset." *Id*. at 147-48. After recognizing Cardona, plaintiff stated "your boys did me dirty; they violated me." *Id*. at 145. Cardona chatted with the plaintiff for a few more moments, then escorted Graham to the hospital. *Id*. at 146. The undersigned fully credits Cardona's testimony.

*Evidence of Plaintiff's Damages*

Plaintiff testified concerning the impacts of this encounter. While the search was going on, he noted:

> I was never in front of so many people that I was handled like that. I was embarrassed and I was really scared because I didn't know -- I didn't do anything, and I didn't know what was going to happen next.

*Id*. at 18. Because he was "feeling upset, betrayed, and humiliated, I was angry, you know," shortly

10

after the incident, plaintiff posted a statement on Facebook later that day, stating:

> With all do [sic] respect, f**k the POLICE[. F]amily and old friends if you support their campaign lose my number. That is all.

*Id.* at 22-23; Def.'s Ex. A (asterisks added). Plaintiff, whose brother is a detective, testified, without contradiction, that he had never posted something like this about the police before. Tr. 23. Plaintiff testified concerning the emotional impact he has suffered as a result of that night:

> I still think about it to this day. Every day when I see a police officer, every time I'm out late and I get a ride home, I just -- it was just a traumatizing experience and I felt betrayed, more so betrayal more than anything . . . .

*Id.* at 25.

Plaintiff had been arrested once before in connection with a DUI. *Id.* at 35-36. During that arrest he was patted down and subjected to a full search. *Id.*[7] He acknowledged having feelings of sadness in connection with that arrest. *Id.* at 36.

## DISCUSSION

As noted, based on the above facts, the plaintiff brings claims of unlawful search, excessive force, false arrest, assault and battery under federal and state law. These are examined below.

*Unlawful Search*

The Fourth Amendment of the United States Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV; *cf.* N.Y. Const. art. I, § 12 (same). Consequently, as to warrantless searches, it has been the law for more than a half century that:

> "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions."

---

[7] While this was admitted over plaintiff's objection for the limited purpose of evaluating damages, the plaintiff's earlier arrest – and his lack of reaction thereto – stands in stark contrast to his reaction to the subject incident. And plaintiff's description of his earlier experiences highlights this distinction, noting "those previous searches were consensual where I consented in the past and my clothes were always on." *Id.* at 36.

11

*United States v. Weaver*, 975 F.3d 94, 99 (2d Cir. 2020) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).[8]

One of those exceptions – one of only two relevant to the instant case – is the need to conduct a pat down search for officer safety. First defined in *Terry v. Ohio*, 392 U.S. 1 (1968), *Terry* permits officers to "conduct an investigative stop . . . and frisk the driver of the car for weapons . . . [based upon] an articulable and objectively reasonable belief that the suspect is potentially dangerous . . . [for] the protection of police officers and others nearby." *Weaver*, 975 F.3d at 100. And this principle has been extended to automobile passengers. See *Maryland v. Wilson*, 519 U.S. 408 (1997) (holding that police officers can order automobile passengers out of the vehicle during traffic stops).

Did the defendants have a basis to conduct a *Terry* search of plaintiff Jenkins? The question is actually a close one. The inquiry turns on whether the officer "is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others." *Weaver*, 975 F.3d at 99. There seems little on this record suggesting that the defendants had a reasonable belief that Jenkins was armed and dangerous. Yet the case at bar does present some unusual facts: following a legitimate motor vehicle violation stop, the driver had snatched evidence from one officer's hand and then proceeded to resist and attack the officers in a most extraordinary way. It may be that a *Terry* pat down of the plaintiff could have been appropriate. *See United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000) ("[T]he reviewing court must consider the totality of the circumstances surrounding the stop."). However, the Court need not answer that question, because the searches conducted did not conform to the limits of a *Terry* search, nor did the defendants intend it to do so.

As one court observed:

As part of a *Terry* stop, an officer may conduct a pat-down frisk ... which consists of

---

[8] Unless otherwise noted, case quotations omit all internal quotation marks, citations, footnotes, and alterations.

> a carefully limited search of the outer clothing ... in an attempt to discover weapons. In order to conduct this limited, self-protective search for weapons, an officer must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous. Since the sole justification of the search is the protection of the police officer and others nearby, it must be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer.

*United States v. McDow*, 206 F. Supp. 3d 829, 850 (S.D.N.Y. 2016). Here, in both the first and second searches of the plaintiff, the defendants rapidly exceeded these bounds, because, as noted, they searched the inside of the plaintiff's pockets, inside the waistband of his pants and underwear and inside of his socks. The purpose of these searches quickly morphed into something other than a protective pat down, because, as the defendants both acknowledged, they were searching for the missing evidence, presumed to be narcotics. But the law is clear:

> police officers cannot conduct searches whenever they conduct an investigative stop of an automobile, because a *Terry* search, unlike a search without a warrant incident to a lawful arrest, is not justified by any need to prevent the disappearance or destruction of evidence of crime.

*Weaver*, 975 F.3d 100. The manner in which defendants conducted the searches, as well as their acknowledgement that – at some point – they were no longer looking for a dangerous object, but specifically for the suspected drug evidence purloined by Graham, make it clear: these searches were not justified by the *Terry* exception. *Ybarra v. Illinois*, 444 U.S. 85, 94-96 (1979) (rejecting the argument that *Terry* authorized searches "to aid [an] evidence-gathering function" given "the important governmental interest in effectively controlling traffic in dangerous, hard drugs and the ease with which the evidence of narcotics possession may be concealed or moved around from person to person"). Moreover, defendants' argument that they had probable cause to believe that plaintiff could have been concealing the missing evidence is belied not only by the facts and circumstances, but by their own testimony, which eschews any suspicious activity by the plaintiff.

Thus, for avoidance of doubt, because it is undisputed that the defendants searched plaintiff for the missing evidence by, among other things, rifling through his pockets, reaching inside his

13

underwear waistband and inside of his socks, the Court finds that both searches were conducted in violation of plaintiff's rights. Even assuming, *arguendo*, that defendants were entitled to conduct a pat down search because of the unusual circumstances at the scene, the first search well exceeded those bounds, and no evidence has been presented justifying the second search in any respect. Defendants' argument that probable cause and/or exigent circumstances justified their search for the missing evidence fails, as they have not made the particularized showing required.

Having established that these searches violated plaintiff's rights, one important factual dispute requires resolution: did Galgano, with Concannon standing by, conduct a strip search on the street? On this record, the Court finds that, while the precise contours remain blurry, the strip search did occur. The evidence supporting this conclusion includes the plaintiff's testimony which is corroborated by, among other things, the Facebook posting and the undisputed statements to Detective Cardona, which demonstrate that the search crossed a significant line.

Defense counsel has urged the Court to consider circumstantial evidence that makes the strip search seem implausible, to wit: would the defendants have taken these steps in full view of so many officers and in a public place? This facially powerful argument is undermined by the absence of the testimony of any of the other officers on the scene, who indisputably witnessed these events and were available to the defense. Furthermore, applying the doctrine of *falsus in uno*, *falsus in omnibus*, the defendants' prepared statements and associated testimony create a strong inference here. The defendants crafted written statements falsely asserting that the plaintiff consented to the search and gave false testimony in their depositions and at trial about the manner in which those statements had been prepared. Those falsehoods give rise to the strong inference that defendants had engaged in unlawful conduct and were attempting to conceal those actions. Further, the facts and circumstances, including the defendants' desperation to recover the evidence which was, embarrassingly, snatched from Galgano's hand, lends credence to plaintiff's account. And, sadly, as unthinkable as these acts seem, they are not without precedent. *See Cotto v. City of Middletown*, 158 F. Supp. 3d 67, 85–86

(D. Conn. 2016) (collecting cases regarding other public strip searches by police).  Of course, since defendants did not have justification to perform a search for the missing evidence, it follows that a strip search was entirely unjustified.  *See Wilson v. Aquino*, 233 F. App'x 73, 77 (2d Cir. 2007) ("It has long been clearly established that strip searches require particular justification."); *Cotto,* 158 F. Supp. 3d at 81 (noting that "Courts in this circuit have routinely held that a partial strip search in a public place where passersby can see a person's naked body is not reasonable absent serious safety concerns") (collecting cases).

Therefore, plaintiff has established liability as against defendants regarding the unlawful searches.

*False Arrest*

The above analysis also leads to the conclusion that defendants are liable under a theory of false arrest.  To establish a false arrest claim under state or federal law, the plaintiff must establish that "(1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged."  *Jocks v. Tavernier*, 316 F.3d 128, 134–35 (2d Cir. 2003).  None of these elements are seriously disputed here.

The facts here are analytically similar to those in *United States v. Babwah*, 972 F.2d 30 (2d Cir. 1992), in which the Second Circuit held that a legally permissible *Terry* stop was "transformed into a *de facto* arrest" and "an unlawful fishing expedition" when a search produced nothing incriminating yet "the [a]gents continued their detention of the defendants." *Id.* at 33-34.  In the same way, even after the first (unlawful) search of plaintiff produced nothing, defendants here kept the plaintiff handcuffed for the better part of an hour, only to then conduct a second search.  *See Grice v. McVeigh*, 873 F.3d 162, 167 (2d Cir. 2017) ("Handcuffing is ordinarily not incident to a *Terry* stop, and tends to show that a stop has ripened into an arrest.").  Assuming that a brief detention of plaintiff for officer safety was warranted, that privilege rapidly evaporated after the removal of

15

Graham from the scene and the arrival of other officers. Holding the plaintiff merely to conduct a second search for the missing evidence pending a failed search of the area and vehicle was unauthorized by law.

*Excessive Force and Assault & Battery Claims*

Relying on *Rizk v. City of New York*, 462 F. Supp. 3d 203 (E.D.N.Y. 2020), plaintiff argues that defendants are liable for use of excessive force, claiming that, in the face of an unlawful arrest, any force used constitutes excessive force assault and battery. DE 43 at 5. However, *Rizk*, a decision which is not binding on this Court, does not so provide, and there is substantial question as to whether the use of minimal force or a case involving *de minimis* physical injury can support an excessive force claim. *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993) (in the Eighth Amendment context, "a *de minimis* use of force will rarely suffice to state a constitutional claim"). The Court need not resolve this issue because, on the facts of this case, any use of force would be subsumed under the aegis of the unlawful search and false arrest claims discussed above, so the damages would be coextensive.

*Qualified Immunity*

Defendants raise the issue of qualified immunity. Whether an official is protected by the doctrine of qualified immunity depends on "whether a reasonable officer could have believed [the] search to be lawful, in light of clearly established law and the information the searching officers possessed." *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). There is nothing about this situation – repeatedly searching, detaining and publicly strip searching the defendant without probable cause – that even comes close to the line. Any reasonable officer would know that such actions violate the Fourth Amendment. As one court observed:

> even though Fourth Amendment case law is often highly-fact specific, that does not mean it produces no "clearly established" law. As set out above, courts in both this circuit and across the country are in agreement about the following propositions: (1) a strip search violates the Fourth Amendment if it is conducted in an unreasonable place and manner, *see, e.g.*, *Galluccio*, 724 F.2d at 304; *Wilson*, 233 Fed.Appx. at 76; and (2) it is unreasonable to conduct

16

> a strip search in full view of the public without exigent circumstances, *see, e.g.*, *Lafayette*, 462 U.S. at 645, 103 S.Ct. 2605; *Rivera*, 928 F.2d at 606–07; *Campbell*, 499 F.3d at 719 ("Courts across the country are uniform in their condemnation of intrusive searches performed in public.") (collecting cases).
>
> Given the lack of ambiguity, *particularly with respect to the unreasonableness of a wholly public strip search* . . . it was not objectively reasonable for Davis to believe that his actions did not violate the Fourth Amendment. *See Rivera*, 928 F.2d at 606–07; *see also Logan v. Shealy*, 660 F.2d 1007, 1014 (4th Cir. 1981) ("We think that, as a matter of law, no police officer in this day and time could reasonably believe that conducting a strip search in an area exposed to the general view of persons known to be in the vicinity whether or not any actually viewed the search is a constitutionally valid governmental invasion of (the) personal rights that (such a) search entails.").

*Cotto*, 158 F. Supp. 3d at 85–86 (emphasis added). And while this remains an objective test, that these defendants knew their actions were unlawful is further demonstrated by their efforts to conceal the facts through false statements and perjurious testimony. Therefore, the doctrine of qualified immunity does not shield these defendants from liability.

*Damages*

Plaintiff sustained no serious physical injury from this encounter, and testified to some emotional aftermath of the incident, but the inquiry does not end there. It is unquestionable that the violations of plaintiff's rights were serious. As Justice Breyer observed, "a strip search that involves a stranger peering without consent at a naked individual, and in particular at the most private portions of that person's body, is a serious invasion of privacy." *Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318, 344–45 (2012) (dissenting opinion). In *Florence*, in which the Court considered contactless strip searches performed in a private setting, Justice Breyer decried the "serious affront to human dignity and to individual privacy" presented by this procedure. Thus, the Court must fix damages to compensate plaintiff based upon the limited garden variety harm articulated at trial.

Beyond the garden variety emotional damages, plaintiff also seeks the imposition of punitive damages against defendants. As the Second Circuit has observed:

> Punitive damages are available in a § 1983 action "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous

17

indifference to the federally protected rights of others."

*Lee v. Edwards,* 101 F.3d 805, 808 (2d Cir. 1996) (quoting *Smith v. Wade,* 461 U.S. 30, 56(1983)). The startling facts of this case, which, at a minimum, demonstrated callous indifference to plaintiff's protected rights, clearly warrant consideration of punitive damages. *Cotto*, 158 F. Supp. 3d at 84 (upholding punitive awards in similar circumstances).

How do these harms translate into damage figures? Plaintiff's counsel urges that "[t]he evidence of Mr. Jenkins's emotional distress supports an award at the high end of Tier I (or 'garden-variety') emotional distress damages" which counsel defines as ranging between $125,000 and $150,000. DE 46 at 3. These figures are taken from cases which are factually distinguishable from the instant case. *See United States v. Asare*, 476 F. Supp. 3d 20, 37-40 (S.D.N.Y. 2020) (involving denial of medical treatment for HIV patients). The citation to *Graham v. City of New York*, 128 F. Supp. 3d 681, 715 (E.D.N.Y. 2015), which involved a $150,000 award to a plaintiff wrongly handcuffed in front of his four-year-old child for an hour, is closer, but that case involved far more extensive evidence concerning emotional impact and greater physical injuries. In upholding the jury's verdict in *Graham*, Judge Matsumoto afforded the jury's verdict deference, found that the award did not shock the conscience of the Court, and cited similar cases involving awards of $12,000 to $15,000. *Id*.

The figures suggested by counsel for Tier I emotional damages are reserved for cases involving far more extreme circumstances, and clearly are inapplicable here. *Compare, e.g.*, *Dancy v. McGinley*, 843 F.3d 93, 114 (2d Cir. 2016) (finding $115,000 not excessive for 17-year-old falsely arrested, booked, fingerprinted, interrogated and held overnight in a cell, noting "his age is of particular significance"). Nor would such figures be appropriate as punitive damages in this case. *Compare Anderson v. Aparicio*, 25 F. Supp. 3d 303, 312 (E.D.N.Y. 2014), *aff'd sub nom. Anderson v. Cty. of Suffolk*, 621 F. App'x 54 (2d Cir. 2015) (recording punitive damage awards reduced to between $75,000 and $185,000 involving significant acts of violence and injury).

Other cases provide far better guideposts. For example, in *Cotto*, a case in which the facts bear a striking resemblance to those at bar, the jury awarded only $1,000 in compensatory damages, but also added $60,000 in punitive damages. The district court reduced the punitive award, ordering remittitur in the total amount of $32,500. *Cotto*, 158 F. Supp. 3d at 90. In *Gonzalez v. City of Schenectady*, 2002 WL 34945084 (N.D.N.Y. Dec. 30, 2002), a case involving an unreasonable strip search conducted at a police station, the court reduced actual damages awarded to $40,000, and upheld punitive damages of $12,500 as against two by-standing officers. In *Kelleher v. New York State Trooper Fearon*, 90 F. Supp. 2d 354, 364 (S.D.N.Y.2000), involving a strip search occurring in private, the court reduced a jury award of punitive damages to $25,000. And in *Wilson*, 233 F. App'x 73, the Second Circuit upheld an award of $25,000 in punitive damages in a case involving an improper strip search, conducted privately but also involving kicking and punching the plaintiff.

While plaintiff did not claim to have suffered significant long-term effects, he certainly articulated some impact of the two illegal searches, including a strip search, and the unlawful detention during this situation. An award limited to nominal damages is not appropriate; however, based on the evidence, a compensatory award of $10,000 seems warranted. In terms of punitive damages, an award of $20,000 as against Galgano – who was the principal agent of the strip search – and $10,000 against Concannon is granted. *See BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, 581 (1996) (cataloging legislative provisions for double, triple or quadruple punitive damages). While their exact roles remain somewhat vague – due largely to their lack of candor – it seems clear that Galgano was more culpable than Concannon, though the latter participated, shares much of the responsibility, did nothing to intervene, and tried to help cover up the events of that evening.

Upon proper application, an award of attorneys' fees and costs will follow.

## CONCLUSION

Based on the foregoing, the Clerk shall enter judgment in favor of plaintiff in the total amount

of $40,000, representing $10,000 in compensatory damages (for which defendants are jointly and severally liable), $20,000 in punitive damages against defendant Galgano and $10,000 in punitive damages against defendant Concannon. Plaintiff's counsel shall file, within 14 days, an application for fees and costs; any response by defendants will be filed ten days thereafter.

**SO ORDERED.**

Dated: Central Islip, New York
       May 18, 2021

/s/ Gary R. Brown
GARY R. BROWN
United States District Judge